COMMONWEALTH *vs.* JAKA CLAIBORNE.

Middlesex. February 6, 1996. - July 25, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, GREANEY, & FRIED, JJ.

*Arrest. Search and Seizure,* Threshold police inquiry, Pursuit, Probable cause. *Constitutional Law,* Search and seizure, Admissions and confessions. *Probable Cause. Practice, Criminal,* Admissions and confessions. *Evidence,* Admissions and confessions.

Police officers properly made a warrantless arrest while outside their jurisdiction but not in "fresh and continued pursuit" of the suspect, where the officers had probable cause to believe that a felony had been committed and that the person arrested had committed it. [278-281] FRIED, J., concurring.

Evidence obtained by police officers as a result of a valid arrest should not have been suppressed. [281]

Statements made to police by a person not under arrest are admissible in evidence at a criminal trial. [281]

The search by police officers of a suspect and his automobile were justified by both probable cause and exigent circumstances and the evidence obtained is admissible. [281]

INDICTMENTS found and returned in the Superior Court Department, two on December 16, 1993, and one on December 28, 1993, respectively.

A pretrial motion to suppress evidence was heard by *Howard J. Whitehead*, J.

An application for leave to file an interlocutory appeal was allowed by *O'Connor*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*David R. Marks*, Special Assistant District Attorney (*John W. McEvoy, Jr.*, Assistant District Attorney, with him) for the Commonwealth.

*Willie J. Davis* for the defendant.

LYNCH, J. The defendant was arrested and charged with armed robbery, receiving stolen property, and unlawfully carrying a firearm. Before trial, he moved to suppress physical

evidence and statements obtained at the time of his arrest. The motion judge allowed the motion and suppressed the evidence. The Commonwealth's application for interlocutory appeal was allowed by a single justice of this court, and the case was transmitted to the full court for determination. We now vacate the order allowing the motion to suppress.

A. *Facts.* The following facts appear from the motion judge's findings and rulings. Between October 27, 1993, and November 11, 1993, four armed robberies having common circumstances were reported to the Newton and Brookline police. On October 27, a male complainant told the Newton police that, late in the evening, he had left a Star Market located near the Newton-Brookline boundary and proceeded to his residence in Newton. On arrival, he was robbed at gunpoint by an individual described as a "mulatto" male, approximately five feet, nine inches tall, medium build, wearing dark running clothes, and displaying a silver handgun.

A short time later on the same date, a second complainant reported to the Brookline police that she, too, had left the same Star Market late in the evening and that she had been robbed at gunpoint on her arrival home in Brookline. She described her assailant as a black male, approximately five feet, ten or eleven inches in height, and displaying a silver handgun. She stated that he had been driving a station wagon.

On November 4, 1993, a third complainant told the Newton police that, late in the evening, she had left a Legal Seafoods restaurant, which is located approximately one hundred yards from the Star Market, and, while headed home, she, too, was robbed at gunpoint. She described her assailant as a light-skinned black male, approximately five feet, nine inches to six feet tall, wearing a dark running suit and wool cap, and displaying a silver handgun.

Finally, on November 11, 1993, a fourth complainant reported to the Newton police that she had been robbed at gunpoint, again late in the evening, at the Sterling Bank in Newton. The Sterling Bank is located in reasonably close proximity to the Star Market and the Legal Seafoods restaurant mentioned earlier. The complainant stated that she and a companion had been bringing a night deposit from a store within the Atrium Mall to the bank. On their arrival at the bank, a man came out of the woods, displayed a handgun and stated, "Give me the money." She described the assailant

as a light-skinned black male, wearing a three-quarter length brown leather jacket, and displaying a silver handgun.[1]

The complainant's companion had pursued the assailant as he fled. The companion saw the assailant enter a maroon or rust-colored "K-car type" station wagon. (A "K-car" is a Chrysler-make automobile characterized by a squarish or boxy appearance.) The companion pursued the vehicle down Route 9 in Newton, and onto the Hammond Pond Parkway. When she lost sight of the vehicle, it was headed toward Brookline.

Noting the similarities among the four reported robberies, the Newton and Brookline police departments undertook a joint investigation. Participating in the investigation were Detective Edward Aucoin of the Newton police and Detectives Barry McNeilly and Laurence Crapo of the Brookline police. As a result of an exchange of information, each officer became privy to all of the facts detailed above.

On November 29, 1993, a fifth armed robbery was reported, this time to the Newton police. It is this robbery which has given rise to the indictments in the instant case. At approximately 10:50 P.M., a female complainant called the Newton police to report that she had just been robbed at gunpoint while at the Sterling Bank. She described the assailant as a light-skinned black male, approximately five feet, ten or eleven inches in height, medium build, slight mustache, wearing dark clothes, and displaying a silver handgun.

The substance of that call, including a description of the perpetrator, was relayed to all police units in Newton and in Brookline. Detective Aucoin directed the dispatcher to indicate that the perpetrator might be wearing a three-quarter length dark-colored leather coat and that he might be traveling in a maroon or rust-colored K-car type station wagon.

Detective McNeilly heard the substance of the Newton radio broadcast. Based on his knowledge of the previous robberies, he instructed other Brookline officers to watch out for a red or maroon K-car type station wagon heading from Newton to Brookline. Given the time at which the most recent robbery had occurred and his belief, based on the circumstances of the previous robberies, that the perpetrator might

---

[1]One or more of the four complainants also described the assailant as being in his early twenties.

be traveling from Newton through Brookline via, first, the Hammond Pond Parkway and then the West Roxbury Parkway, he and Detective Crapo traveled to a point on the West Roxbury Parkway where they thought they might be able to intercept the perpetrator.

In the course of this maneuver the Brookline detectives traveled out of Brookline into Boston. There they saw a maroon station wagon heading around a rotary from the general direction of Newton. The vehicle was a "Pontiac 6000" a vehicle which had the same squarish or boxy characteristics as a K-car.

From their initial vantage point, the Brookline detectives could not determine the number or appearance of the occupants of the station wagon. At a traffic light, they pulled alongside the station wagon. They saw that the defendant, the driver and sole occupant, was a light-skinned black male with short hair and a thin mustache, appearing to be in his early twenties. Soon thereafter, the officers stopped the station wagon.

When the detectives approached the passenger side door, the defendant removed his hand from the console of the station wagon located in the area of the front seat. At the request of the officers the defendant then got out of the automobile. At that time one of the officers noticed a black leather jacket bunched up on the driver's seat and a black knit cap on the floor of the vehicle. Since the radio description of the robber's clothing included a black leather coat and a black knit cap, the defendant was told to put his hands on the roof of the vehicle and was "pat-frisked."

Although the pat-frisk produced no weapon, the defendant was told that he fit the description of the suspect in a robbery that had happened earlier that night, as well as several other robberies. The defendant responded, "I robbed the ladies tonight. I didn't do any of the other robberies." At that point, Detective McNeilly gave the defendant the full Miranda warnings. A search of the station wagon revealed a silver-plated revolver, with the hammer cocked, in the center console from which the defendant had withdrawn his hand at the time of the stop.

B. *Discussion.* The parties agree that, at the time of the stop, the Brookline police officers "had enough specific, articulable facts to warrant a reasonable suspicion of criminal

conduct." *Commonwealth* v. *Wren,* 391 Mass. 705, 708 (1984). Therefore, a threshold inquiry would have been permitted under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights had it occurred within the officers' jurisdiction. See *Commonwealth* v. *Mercado,* 422 Mass. 367, 370 (1996); *Commonwealth* v. *Willis,* 415 Mass. 814, 821 (1993); *Commonwealth* v. *Moses,* 408 Mass. 136, 140 (1990); *Commonwealth* v. *Wren, supra.* Similarly, Boston police officers possessed of the information available to the Brookline police officers would have been justified in stopping the defendant in Boston.

The defendant argues that the Brookline police officers had no authority to conduct the initial investigatory stop in this case because it occurred outside their territorial jurisdiction. The Commonwealth responds that: (1) the stop was permissible because there was probable cause; (2) even if probable cause was lacking, the police had authority to make an extraterritorial stop based on reasonable, articulable suspicion; and (3) even if the stop was illegal, it does not follow that the evidence must be suppressed. We conclude that, if the police had probable cause to stop the defendant, the evidence need not be suppressed, and further that the police had probable cause to believe that the defendant had committed a crime.

A police officer may make a warrantless arrest of any person whom he reasonably believes has committed a felony. *Commonwealth* v. *Harris,* 11 Mass. App. Ct. 165, 168 (1981). "The officer's official authority to make such a warrantless arrest, however, is limited to the territorial jurisdiction of his appointment . . . unless the officer is 'on fresh and continued pursuit' of a felon 'for any offence committed in his presence within his jurisdiction.' " *Commonwealth* v. *Harris, supra,* quoting G. L. c. 41, § 98A (1994 ed.).[2] See *Commonwealth* v. *Grise,* 398 Mass. 247, 249 (1986); *Commonwealth* v. *Gullick,* 386 Mass. 278, 282-283 (1982) (construing New Hampshire law). See also *Commonwealth* v. *Morrissey,* 422 Mass. 1, 5

[2]General Laws c. 41, § 98A (1994 ed.), provides, in relevant part: "A police officer of a city or town who is empowered to make arrests within a city or town may, on fresh and continued pursuit, exercise such authority in any other city or town for any offence committed in his presence within his jurisdiction for which he would have the right to arrest within his jurisdiction without a warrant . . . ."

(1996) (officer may receive authority to make stop from officer within jurisdiction);[3] *Commonwealth* v. *LeBlanc,* 407 Mass. 70, 72 (1990) (statute only applies to arrestable offense); *Commonwealth* v. *Zirpolo,* 37 Mass. App. Ct. 307, 310-311 (1994) (where crime committed in presence of one officer, that officer may relay information to other officers, who may then conduct fresh pursuit). Here, the fresh pursuit statute does not apply because the offense was not committed in the officers' presence and the officers first saw the vehicle in Boston. Cf. *Commonwealth* v. *Owens,* 414 Mass. 595, 599-600 (1993).

"When a police officer makes a warrantless arrest outside of his jurisdiction, and not in 'fresh and continued pursuit' of the suspect within the meaning of G. L. c. 41, § 98A, then he acts as a private citizen, and the arrest will be held valid only if a private citizen would be justified in making the arrest under the same circumstances." *Commonwealth* v. *Grise, supra* at 250. A private citizen may lawfully arrest someone who has in fact committed a felony. (Generally, the "in fact committed" element must be satisfied by a conviction. *Commonwealth* v. *Harris, supra* at 170, citing *Commonwealth* v. *Lussier,* 333 Mass. 83, 92 [1955].) In *Harris,* the Appeals Court relaxed the requirements for a citizen's arrest where the arrest was made by police officers acting outside their territorial jurisdiction. *Id.* at 170-171 & n.5. The court noted that applying the "in fact committed" requirement to extraterritorial police officers acting responsibly would not further the purpose of the requirement: "to deter private citizens from irresponsible action." *Id.* at 171. Instead, "rigid compliance" with the citizen's arrest rule in cases involving police officers in jurisdictions other than their own would only "frustrate legitimate law enforcement activities." *Id.* Therefore, instead of requiring that the felony be "in fact committed," the *Harris* court stated that, to make a citizen's arrest, the officers needed only "probable cause to believe that a felony had been committed and that the person arrested had committed it." *Id.* at 172.

---

[3]Unlike the officer in *Commonwealth* v. *Morrissey,* 422 Mass. 1 (1996), the Brookline officers did not seek or receive authority from Boston police to pursue the defendant. Moreover, there is also no indication that Detectives McNeilly and Crapo were sworn in as special police officers in the city of Boston. See *Commonwealth* v. *Dise,* 31 Mass. App. Ct. 701, 704 n.6 (1991), and cases cited.

We agree that the requirements for a citizen's arrest are relaxed in the case of arrests by police officers acting outside their jurisdiction and we conclude that the reasoning of *Harris* applies in this case.[4] At the time of the stop the officers had probable cause to arrest the defendant. "[I]t is immaterial whether [the officers] subjectively intended to make only an investigative stop." *Commonwealth* v. *Gullick, supra* at 283. At the time of the stop, Detectives McNeilly and Crapo knew that: the defendant was a light-skinned black male with a mustache in his mid-twenties; he was driving a "boxy" maroon station wagon; he was alone; he was located at a place and time consistent with having left the scene of that night's reported robbery; and the direction he was heading was consistent with the route taken by the suspect in one of the previous robberies. All this information, consistent with what the police knew before they encountered the defendant's vehicle, was "sufficient to warrant a person of reasonable caution in believing that the defendant had committed . . . a crime." *Id.* See *Commonwealth* v. *Pietrass*, 392 Mass. 892, 897-898 (1984); *Commonwealth* v. *Cruz*, 373 Mass. 676, 685 (1977); *Commonwealth* v. *Lawton*, 348 Mass. 129, 133 (1964). See also *Commonwealth* v. *Riggins*, 366 Mass. 81, 87 (1974). Therefore, even though the stop was made outside the detectives' territorial jurisdiction, it was permissible and did not violate the defendant's constitutional or statutory rights.

Accordingly, we conclude that the stop of the defendant by Brookline detectives in Boston does not require that evidence obtained as a result of the subsequent arrest and searches be suppressed. We also agree with the conclusions of the judge below: the defendant was not in custody when he stated that he "only robbed the ladies tonight" and so that statement was admissible although it was obtained before Miranda warnings were given, see *Commonwealth* v. *Owens, supra*; the search of the defendant and his automobile were justified by the presence of both probable cause and exigent circumstances, see *Commonwealth* v. *Markou,* 391 Mass. 27, 30 (1984). All the fruits of these searches are therefore admissible against the defendant.

The order allowing the motion to suppress is vacated, and

---

[4] The rule we apply here pertains only to felony arrests by properly appointed police officers and not to persons who may have powers of arrest in some circumstances.

the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

FRIED, J. (concurring). I join the opinion of the court. I believe that on an appropriate occasion we should reconsider our decisions in *Commonwealth* v. *Grise*, 398 Mass. 247 (1986), and *Commonwealth* v. *LeBlanc*, 407 Mass. 70 (1990), insofar as they apply the exclusionary rule to evidence discovered after an action defective only by reason of a police officer's acting beyond his territorial jurisdiction.